UNITED STATES of America,
Plaintiff-Appellee,

v.

Ruben MIRANDA–URIARTE,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Javier MIRANDA–BELTRAN,
Defendant-Appellant.

Nos. 80–1520, 80–1521.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 1981.

Decided July 6, 1981.

---

John Gallagher, Gallagher, Soley & Gollmer, Inc., Fresno, Cal., for defendant-appellant in # 80–1520.

Edward P. Moffat, Asst. Federal Defender, Fresno, Cal. for defendant-appellant in # 80–1521.

Phillip S. Cronin, Asst. U. S. Atty., Fresno, Cal., for United States in both cases.

Before KILKENNY and SNEED, Circuit Judges, and GRANT, District Judge.*

KILKENNY, Circuit Judge:

On April 10, 1980, appellants Uriarte and Beltran, together with Israel Parra-Rojo (Parra), were jointly indicted on Count I for conspiracy to distribute heroin[1] and on Count II for possession with intent to distribute heroin.[2] Additionally, Parra was indicted on Count III for a violation of 21 U.S.C. § 843(b) (telephonic communication

---

* The Honorable Robert A. Grant, Senior United States District Judge for the Northern District of Indiana, sitting by designation.

1. 21 U.S.C. § 846 is the conspiracy statute:
   "Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

The substantive offense which the defendants allegedly conspired to commit is defined by 21 U.S.C. § 841(a)(1), which provides:
   "(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
      (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;".

2. The possession statute, 21 U.S.C. § 841(a)(1), is set out in note 1 *supra*.

for facilitating the commission of a felony), and Beltran was charged in Count IV with unlawfully carrying a firearm during the commission of a felony in violation of 18 U.S.C. § 924(c)(2). The case was tried before a jury in late June, 1980. The firearm allegation was dismissed at the close of all the evidence. The jury returned guilty verdicts on all remaining counts against the defendants. On July 21, 1980, Uriarte and Beltran were sentenced to five year terms on Count I and five year terms on Count II with a special parole term of three years as to Count II. The sentences were ordered to run concurrently. Each appellant appeals from his judgment of conviction and sentence.

## FACTUAL BACKGROUND

Gregorio Nunez (Nunez), who has been an undercover informant for the Drug Enforcement Administration (DEA) for the last seven years, testified at trial about his efforts to arrange a purchase of heroin. Nunez posed as the agent for the prospective buyer—DEA agent Camarena. Nunez and Camarena had, in January or February of 1980, negotiated a heroin sale with Parra. Parra acted as a broker in obtaining a source of supply.

In March, Nunez attempted to arrange another heroin sale through Parra. This transaction led to the charges in the instant case. Nunez, on March 18, 1980, met with Parra who discussed the possibility of a heroin sale from his brother-in-law, Uriarte. Nunez was also furnished a sample. Nunez testified as to Parra's statements that Uriarte was the source of the sample and that Uriarte would be the source of the heroin for the proposed transaction.

Nunez testified that on March 20, 1980, he met with all three defendants at Parra's home to discuss a sale of twenty ounces of heroin. Nunez was furnished a second sample—allegedly from Uriarte. The government contends that this sample was turned over to Camarena on March 27, 1980, and introduced into evidence as Government's Exhibit No. 1.

The negotiations continued over the next seven days. On March 21, 1980, Nunez met with Parra and Uriarte to discuss the sale. On or about March 24, 1980, Nunez was furnished a third sample from a man called Marcos. Marcos snorted this sample. On March 26, 1980, Nunez met with Parra, Uriarte, and Marcos, and Uriarte said that he only had ten ounces of heroin available. Later that day, Nunez met with Parra, Uriarte, and Beltran at Parra's home, and Beltran told Nunez that if this sale went smoothly they would sell him four kilos of heroin at a later date.

On March 27, 1980, Uriarte and Beltran met with Nunez and Parra at the latter's home. Uriarte explained that the first sale would only be for five ounces, but that if everything went well they would have four kilos of heroin available for sale. After Parra phoned Camarena to confirm the sale and the possible future purchases, Uriarte drove Nunez, Beltran, and Parra to Visalia in his car. Enroute, Uriarte told Beltran to put the gun under the seat. Nunez, although he never actually saw the weapon, saw Beltran bend forward and down in his seat in response to Uriarte's statement. Nunez also testified that Beltran threatened to kill him if the police showed up. Uriarte and Parra also allegedly made similar threats during the trip. During the trip, Beltran also apparently told Nunez that there would be more heroin available at a later date.

While enroute to Visalia, Parra and Nunez made a phone call to Camarena and the parties arranged to meet at the Goshen Bus Depot. The parties met at the depot and Parra introduced Camarena to Uriarte and Beltran. In response to questions, Uriarte informed Camarena that everything was ready and that he had five ounces of heroin with him. Uriarte retrieved a tinfoil package from the car and Camarena told the parties he had $14,000.00 with him, $500.00 for Parra's "broker fee." After receiving the opened package, Camarena first asked Uriarte if it was good and Uriarte replied

affirmatively. Camarena asked Beltran if it was good and Beltran replied that it was good. Camarena stated that he wished to purchase twenty more ounces of heroin. Parra replied that they could deliver that amount the next day, but Uriarte stated that Camarena would have to wait a week.

Camarena and the agent who had accompanied him then left the meeting at the car, ostensibly to get the purchase money. These two agents then gave a pre-arranged arrest signal and the authorities moved in for the arrest. The tinfoil package with the five ounces of heroin was retrieved from the ground next to Uriarte's car along with a .38 caliber revolver from underneath the seat where Beltran allegedly had been seated when arrested. The five ounces of heroin were introduced as Government's Exhibit No. 2 and the gun as Government's Exhibit No. 3.

## ISSUES

I. Whether it was error to admit several coconspirator statements.

II. Whether the evidence was sufficient to convict Beltran of conspiracy and possession.

III. Miscellaneous issues.

A. Whether the court misinstructed the jury regarding the use of coconspirator statements.

B. Whether the court abused its discretion in admitting Government's Exhibit No. 1.

C. Whether the court erred in ruling that Uriarte could be cross-examined on the gun.

## DISCUSSION

### I.

A. *Coconspirator Statements.*

■ FRE 801(d) provides: "A statement is not hearsay if ... (2) The statement is offered against a party and is ...(E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Rule 801(d)(2)(E) requires a foundation that (1) the declaration was in furtherance of the conspiracy, (2) it was made during the pendency of the conspiracy, and (3) there is independent proof of the existence of the conspiracy and of the defendant's connection thereto. *United States v. Eubanks,* 591 F.2d 513, 519 (CA9 1979). It is the responsibility of the trial judge to determine whether a sufficient foundation has been established for declarations to be admissible under the coconspirator exception. *Eubanks, supra.* The order of proof is within the sound discretion of the trial judge, *United States v. Zemek,* 634 F.2d 1159, 1169 (CA9 1980), who may conditionally admit coconspirator statements subject to a later motion to strike. In ascertaining whether the foundation has been established, we can, therefore, consider all the evidence independent of the challenged statements, regardless of the order of proof. *United States v. Batimana,* 623 F.2d 1366, 1369 (CA9 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 617, 66 L.Ed.2d 500 (1981). In addition, the evidence is to be considered in a light most favorable to the government. *United States v. Dixon,* 562 F.2d 1138, 1141 (CA9 1977), *cert. denied,* 435 U.S. 927, 98 S.Ct. 1494, 55 L.Ed.2d 521 (1978).

■ The quantum of independent proof required in this circuit is "sufficient, substantial evidence to establish *a prima facie case* that the conspiracy existed and that the defendant was part of it." *United States v. Weiner,* 578 F.2d 757, 768 (CA9 1978) [Emphasis supplied], *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651; *Dixon, supra.* Once the existence of the conspiracy has been clearly established, independent evidence is necessary to show *prima facie* the defendant's connection with the conspiracy, even if the connection is slight. *Weiner, supra,* at 769. The evidence of the "slight" connection, however, must be of the quality which will reason-

ably support a conclusion that the defendant wilfully participated in the unlawful plan with the intent to further some object or purpose of the conspiracy. *United States v. Testa*, 548 F.2d 847, 853 (CA9 1977).

### 1. *Uriarte.*

Uriarte urges that Nunez should not have been permitted to testify as to Parra's statements on March 18, 1980, to the effect that Uriarte was the source of the first sample and the source of the heroin for the proposed transaction. He says that these statements were not admissible under FRE 801(d)(2)(E) because there was no independent evidence that a conspiracy existed as of March 18, 1980, or that Uriarte was a member of the conspiracy as of that date. The statements were admitted over objection. Uriarte did not, however, object that the testimony was hearsay[3] or that its admission would violate the confrontation clause. In fact, Uriarte has not brought to our attention any indication that the confrontation issue was ever presented to the trial judge.

There is, admittedly, no direct evidence, apart from the challenged statements, which establishes Uriarte's involvement in the conspiracy as of March 18, 1980. We believe, however, that the circumstantial evidence presented was sufficient to permit a reasonable juror to conclude that a conspiracy, of which Uriarte was a member, existed as of March 18, 1980. The government presented evidence of a chain of events from March 18, 1980, to March 27, 1980. It seems clear that these events were interconnected—they were all part and parcel of the same transaction. The government also presented evidence of the structure of the conspiracy, *i. e.* it identified the role that each defendant played in the transaction. The evidence indicates that Parra, on this and at least one other occa-

sion, was acting as a broker in identifying potential sources of heroin. There is abundant independent evidence that the source Parra found for Nunez and Camarena in the instant case was Uriarte. In fact, the independent evidence of events from March 20–March 27, 1980, indicates that Uriarte was the bellwether of the entire plan. There was testimony that he was the conspirator who controlled the negotiations concerning the amount of heroin to be sold and the time when it would be available. All of this supports an inference that the conspiracy was in existence when the first meeting in the chain of events leading to the sale took place, and that Uriarte, the ultimate source of the heroin, was connected to it. The challenged statements, which placed Uriarte as the source of the first sample and as the source for the heroin to be sold, simply provide direct evidence for a proposition that the jury would have been warranted in inferring from the other direct and circumstantial evidence presented.

■ Moreover, the March 18, 1980, declarations were merely cumulative. The evidence of Uriarte's participation in the conspiracy—indeed of his role as the source—is overwhelming. Under the circumstances of this case, the admission of the challenged statements, if it was error, did not affect substantial rights of Uriarte. For that matter, the evidence is so convincing that we hold the error, if any, would be harmless beyond a reasonable doubt.

### 2. *Beltran.*

Beltran contends that the district judge violated the rule prohibiting the admission of hearsay and the confrontation clause by admitting testimony as to statements made by Parra and Uriarte. In his briefs on appeal, Beltran has made only one specific reference to such a statement. He objected to the admission of Nunez's testimony as to

---

**3.** In light of our disposition, we need not address whether this failure precludes Uriarte

from obtaining a reversal on this basis.

whether Uriarte said anything in regard to the heroin sample Nunez received on March 20, 1980. The objection was overruled [4] and Nunez testified that "He [Uriarte] only asked me if I liked it [the sample] so that he could get me ten pieces."

Although Beltran has not brought any other specific statements to our attention, our review of the trial transcript does reveal that Beltran did object to the admission of several other statements. For example, Beltran objected to Camerena's testimony about his March 27, 1980, phone conversations with Parra. The objection was overruled. Beltran's attorney and the judge agreed, however, that "this is all subject to being struck if they [the govern-ment] cannot establish the conspiracy." During the phone conversations, Parra stated, in effect, that "they had the heroin" and that "we are on our way." [5] At the close of the government's case, Beltran requested that the court rule on the admissibility of the coconspirator statements. The court responded: "Well, certainly by allowing that tape [of the phone conversations] in, inferentially, I did not think I had to paint you a picture, that I had found that the Government certainly had established such prima facie case to let the matter go to the jury." Beltran has not brought to our attention any indication that the confrontation clause issue was ever presented to the trial judge.

4. The following proceedings took place before the judge permitted Nunez to respond:

"THE COURT: All right. Ladies and gentlemen of the jury, what this is about is a slightly different problem than I addressed to you before. A lawsuit can't all be tried and proven at once. It is the position of the Government that ultimately all the evidence will prove that there was a conspiracy between the three defendants to do certain things, as I read to you in the indictment. At the moment the preliminary testimony perhaps is not such for you to find beyond a reasonable doubt that such conspiracy actually took place. This particular testimony, for the time being, is only to be considered against Ruben Miranda-Uriarte.

However, if at the conclusion of the case, considering all the testimony, if such a conspiracy has been proven to your satisfaction, you may then consider any statement made by any one of the co-defendants as being applicable to all co-defendants.

Is that satisfactory, Mr. Moffatt [Beltran's attorney]?

MR. CRONIN [Assistant U. S. Attorney]: Yes, your Honor.

MR. MOFFAT: Yes, your Honor.

THE COURT: Thank you."

5. Prior to the admission of the challenged testimony, the district judge stated:

"Ladies and gentlemen, the Court is going to allow you to hear the tape of a conversation between Agent Camarena and one of the defendants. This tape may or may not be admissible or useful to you as to the defendants other than the speaker, Mr. Parra-Rojo. However, I want to read one of the instructions that I will give you again prior to your deliberations concerning the consideration of evidence as that evidence refers to other de-fendants, and specifically it is the consideration of evidence with regard to statements or acts of co-conspirators. In order to determine whether this evidence can be used against any defendant other than the speaker defendant, Parra-Rojo, it will be necessary for you to make a determination, a preliminary determination at the appropriate time, when the case is finally concluded to you, as to whether or not the tests that I am going to give you have been made. So as you listen to this recording, please keep this special instruction in mind.

'Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed and that a defendant was one of the members, then the statements thereafter knowingly made and the acts thereafter knowingly done by any person likewise found to be a member, may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the defendants and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy.

'Otherwise, any admission or incriminatory statement made or act done outside of court, by one person, may not be considered as evidence against any person who was not present and who did not *see* the statement made or see the act done.

'Therefore, statements of any conspirator, which are not in furtherance of the conspiracy, or made before its existance [sic], or after its termination, may be considered only—may be considered as evidence only against the person making them.' "

Beltran alleges that because there was insufficient independent evidence to establish a *prima facie* case of his complicity in the conspiracy the trial judge erred in admitting Nunez's testimony as to statements made by Parra and Uriarte.[6] We disagree. The independent evidence was clearly sufficient to establish a *prima facie* case that Beltran had the requisite connection with the conspiracy. There was testimony that Beltran was present at many of the crucial events during the course of the conspiracy. More importantly, the testimony as to Beltran's own statements is clearly sufficient to support a finding that he was a knowing participant. There was testimony that Beltran, on two occasions, told Nunez that if this sale went smoothly they would have more heroin available. There was testimony that Beltran threatened to kill Nunez if the police showed up at the sale. In addition, Beltran, at the scene of the heroin sale, in response to a question from Camarena about whether the package of heroin was good, stated that *it was good.* The evidence was clearly sufficient to establish that Beltran had the requisite connection with the conspiracy. Consequently, the district judge did not err in admitting the coconspirator statements.

### B. *Confrontation Clause.*

On appeal, appellants contend that the trial judge's admission of the challenged coconspirator statements denied them their Sixth Amendment right to confront the witnesses against them. We note that appellants have not directed our attention to any portion of the record indicating that they raised the confrontation clause issue before the trial judge. We are not required, therefore, to address this contention. In any event, our review of the record indicates that appellants are not entitled to reversal on this basis.

## II.

"We recognize, as we must, that the initial inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether, after 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)." *United States v. Melchor-Lopez,* 627 F.2d 886, 890 (CA9 1980).

We emphasize that a criminal conspiracy need not be proved by direct evidence and that a common scheme or plan may be inferred from circumstantial evidence. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Turner,* 528 F.2d 143, 162 (CA9 1975), *cert. denied sub nom. Lewis v. United States,* 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371. Time and time again, we have said that circumstantial evidence is not inherently less probative than direct evidence. *United States v. Green,* 554 F.2d 372, 375 (CA9 1977); *United States v. Cruz,* 536 F.2d 1264, 1266 (CA9 1976); *Turner, supra,* at 162; *United States v. Nelson,* 419 F.2d 1237, 1239 (CA9 1969).

In measuring an alleged conspirator's complicity, we must decide if there was sufficient evidence to conclude that the defendant had at least a slight connection with the conspiracy and that the defendant knew he was connected therewith. *Zemek, supra,* at 1170–71; *United States v. Smith,* 609 F.2d 1294, 1297 (CA9 1979). With these guidelines in mind, we have no hesitancy whatsoever in holding that the evidence, both direct and circumstantial, of Beltran's participation in the conspiracy was sufficient to sustain the ver-

---

6. We note that Beltran has only directed our attention to one such statement. See text at note 4 *supra.* That statement surely did not implicate Beltran in the conspiracy which he admits existed. We note that not all coconspirator statements are subject to a hearsay chal-

lenge. Many such statements do not involve the hearsay rule. *See e. g., United States v. Wolfson,* 634 F.2d 1217 (CA9 1980); *United States v. Calaway,* 524 F.2d 609, 613 (CA9 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976).

dict on the conspiracy count. As we have discussed above, the jury could reasonably have concluded, beyond a reasonable doubt, that Beltran was a knowing participant in the conspiracy he admits existed. And, the evidence was clearly sufficient to support the possession conviction. We believe that Beltran's involvement with the heroin was sufficient to establish the essential elements of that offense. In any event, it is settled law that a coconspirator is liable for substantive offenses committed in furtherance of the conspiracy in which he does not actually participate. *Testa, supra,* at 855.

III.

■ *A.* Appellants allege that the trial judge misled the jury during trial when he gave a preliminary explanation of the law on coconspirator's statements. See note 4 *supra* for the text of the challenged instruction. Uriarte did not object at the time this explanation was given. Uriarte does not allege that there were any errors in the final instructions to the jury on coconspirator statements. Beltran alleges that the judge seemed to indicate that the admissibility question was one for the jury. Beltran specifically approved the judge's initial statement to the jury. And Beltran admits that the court later found the prerequisite to admissibility, *i. e.* a *prima facie* case. Beltran never objected to the final instructions to the jury. Neither party explains how the judge's statement prejudiced them, and we have certainly found no plain error. In addition, the final instructions to the jury were unduly generous to appellants. *See Testa, supra,* at 853, n. 3; *United States v. King,* 552 F.2d 833, 849 (CA9 1976), *cert. denied* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

■ *B.* Uriarte contends that the court erred in admitting Government's Exhibit No. 1—the sample of heroin. The government argues that the sample introduced was the second sample Nunez received. Uriarte asserts that Nunez's testimony as to the source of this sample was inconsistent and that, therefore, there was an ambiguity as to the source of the sample. Uriarte asserts that, because of this ambiguity, the sample was irrelevant.

■ The standard of relevancy is not strict. FRE 401 provides: "'Relevant evidence' means evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [Emphasis added]. The determination of relevancy is committed to the sound discretion of the trial judge. The judge noted that the jury would have to resolve any inconsistencies. Uriarte has failed to demonstrate that the admission of the evidence constituted an abuse of discretion.

*C.* Uriarte contends that the district judge erroneously ruled that if Uriarte testified he would be subject to cross-examination on the gun found in the car and that because of this ruling he did not testify. He says the ruling was erroneous because the presence of the gun in the car was irrelevant to the issue he offered to testify to on direct—his participation in and knowledge of Parra's drug dealings.

■ A defendant who testifies at his trial may be cross-examined as to all matters reasonably related to the issues he puts in dispute by his testimony on direct. *Brown v. United States,* 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); *United States v. Sturgis,* 578 F.2d 1296, 1300–01 (CA9 1978), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 430. The extent of cross-examination is a matter within the discretion of the trial court. *United States v. Palmer,* 536 F.2d 1278, 1282 (CA9 1976). The government is clearly correct in arguing that the gun was reasonably related to the issue Uriarte was going to testify to— his knowledge of and participation in the on-going transaction. Its presence and the statements he made which directly and indirectly involved the weapon were clearly rel-

**1354**

evant to whether he was simply an unwitting participant in a drug transaction. A defendant has no right to avoid cross-examination on matters which call into question his claim of innocence. We find that the district judge's ruling that Uriarte could be cross-examined on the gun was not erroneous.

Finding no reversible error, we conclude that the judgments should be affirmed.

IT IS SO ORDERED.