FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

TOWN OF COLORADO CITY,
ARIZONA; TWIN CITY WATER
AUTHORITY, INC.,
*Defendants-Appellants.*

No. 17-16472

D.C. No.
3:12-cv-08123-
HRH

OPINION

Appeal from the United States District Court
for the District of Arizona
H. Russel Holland, District Judge, Presiding

Argued and Submitted April 18, 2019
San Francisco, California

Filed August 26, 2019

Before: MICHAEL DALY HAWKINS and MILAN D.
SMITH, JR., Circuit Judges, and BARBARA M. G.
LYNN, [*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Barbara M. G. Lynn, Chief United States District
Judge for the Northern District of Texas, sitting by designation.

## SUMMARY**

### Civil Rights

The panel affirmed the district court's judgment in favor of the United States in its action against the Town of Colorado City, Arizona brought under the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601, which prohibits any governmental authority from engaging in a pattern or practice of conduct by law enforcement officers or government agents that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

The United States brought a civil action against the municipal defendants and their utility providers alleging a pattern or practice of discrimination against residents who were not members of Fundamentalist Church of Jesus Christ of Latter-Day Saints.  The essential allegation of the United States was that defendants functioned as an arm of the Church and conspired with Church leaders to use municipal resources to advance Church interests.

The panel held that, in holding that defendants violated § 12601, the district court correctly interpreted the statute to allow for *respondeat superior* liability. The panel rejected the assertion that § 12601 requires the United States to demonstrate that the Towns instituted an official municipal policy of violating residents' constitutional rights and therefore declined to extend the holding in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) to claims pursuant to § 12601.  The panel held that, had Congress wished to eliminate *respondeat superior* liability under § 12601, it could have easily done so with explicit

statutory language.  Its decision not to do so suggested that it intended for § 12601, like most civil rights statutes, to allow for *respondeat superior* liability.

The panel held that it was not necessary to address Colorado City's arguments about the district court's Fourth Amendment-related factual findings because, even if those arguments were correct, the error was harmless.  The panel further held that the district court did not err in admitting the statements of Church leaders under the co-conspirator exception to the rule against hearsay.  The panel held that taken together, the evidence was sufficient to establish that defendants conspired with Church members to advance the Church's illicit objectives.  While certain other statements admitted by the district court did not fall under the co-conspirator exception, the district court did not err in admitting them because they were otherwise admissible. The panel concluded that because of the overwhelming evidence that Colorado City deprived non-Church residents of their constitutional rights, it was more probable than not that the court would have reached the same verdict on the United States' § 12601 claim even if the challenged statements had been excluded.

## COUNSEL

Jeffrey C. Matura (argued) and Melissa England, Barrett & Matura P.C., Scottsdale, Arizona; R. Blake Hamilton, Durham Jones & Pinegar P.C., Salt Lake City, Utah; for Defendants-Appellants.

Christine A. Monta (argued) and Thomas E. Chandler, Attorneys; John M. Gore, Acting Assistant Attorney General; Appellate Section, Civil Rights Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

## OPINION

M. SMITH, Circuit Judge:

When the United States suspected the Town of Colorado City, Arizona (Colorado City) and Hildale City, Utah (collectively the Towns) of engaging in a pattern or practice of violating the constitutional rights of residents who were not members of the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS or the Church), it sued the Towns pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601 (formerly codified at 42 U.S.C. § 14141).[1]  After a 44-day trial, a jury returned an advisory verdict finding the Towns liable.  The district court handed down a judgment holding that the Towns violated § 12601, and granted injunctive relief against the Towns.

Colorado City[2] appeals the district court's decision on three grounds, all of which fail.  The district court correctly interpreted § 12601 when it concluded that the statute does

---

[1] The United States also sued the Towns pursuant to the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, but this appeal does not concern that claim.

[2] Although Hildale City also appealed the district court's decision, it has since withdrawn from this proceeding.

not require an official municipal policy of violating constitutional rights in order for the United States to prevail. Colorado City's arguments about the district court's factual findings, even if they are correct, do not entitle it to relief because the district court's judgment is supported on other grounds. The district court did not err in admitting several statements that Colorado City contends were hearsay. We affirm the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Straddling the Utah and Arizona border, the Short Creek Community is a religious settlement composed of the Towns. Most residents are FLDS members and follow the teachings of Warren Jeffs, whom they sustain as a prophet and leader of the Church. Since becoming the head of the Church in 2002, Jeffs has promulgated a strict set of rules for FLDS members, such as prohibitions on: vacations, toys, attendance at public schools, and displays of affection between husbands and wives.

The United States brought a civil action against the Towns and their municipal utility providers, Twin City Water Authority and Twin City Power, alleging a pattern or practice of discrimination against non-FLDS residents. The essential allegation of the United States was that the Towns functioned as an arm of the Church and conspired with FLDS leaders to use the Towns' municipal resources to advance Church interests. The complaint stated a claim against the Towns pursuant to § 12601 for violating the Establishment Clause of the First Amendment, the Fourth Amendment's prohibition on unreasonable searches and seizures, and the Equal Protection Clause of the Fourteenth Amendment. Because § 12601 does not provide a right to a jury trial, the parties agreed that a jury would render only an advisory verdict.

At trial, the United States argued that FLDS leaders selected the Towns' leaders and members of the Colorado City Marshal's Office (Marshals), which served as the police department for the Towns.  The United States offered testimony that the FLDS "ran the [Towns'] government" and that the Towns' government "was a part of the [C]hurch."  It also offered evidence demonstrating that FLDS leaders instructed local government officials on how to perform their jobs in a way that advanced the Church's interests. Marshals, for example, ignored violations of the law—such as underage marriage, unlicensed drug distribution, and food stamp fraud—by FLDS members.

The Marshal's Office worked closely with FLDS leaders.  Marshals helped FLDS leaders evade service of process by the FBI, and ran computer checks of license plates of unfamiliar cars, when asked to do so by FLDS leaders.  Cooperation between the Church and the Towns even extended to sharing tangible resources.  For example, the Marshal's Office provided equipment such as tasers and night-vision binoculars to Church Security, the FLDS's private security force.

The Marshal's Office also helped Jeffs after he became a fugitive.  Less than three years after Jeffs became head of the Church, the United States secured a warrant for his arrest on charges of sexual misconduct with children.  The FBI sought the help of the Marshal's Office to locate Jeffs, but the Marshals did not cooperate; instead, they hindered the FBI's investigation and helped Jeffs hide for over a year. The Marshals also provided Jeffs with financial assistance and information on the activities of federal law enforcement to help him evade capture.  The Marshals even helped destroy evidence of the crimes for which Jeffs was accused by burglarizing a former FLDS member's business.

The United States also presented evidence that members of the Marshal's Office discriminated against non-FLDS residents.  It contended that the Marshals failed to provide effective police protection to residents who were not FLDS members.  One non-FLDS resident testified, for example, that a Marshal drove to his home, walked out of his car, and "just came over and grabbed my arm and [] bent it up around my back."  Although the resident explained that he had a legal right to occupy the property and presented an occupancy agreement, he was charged with trespassing.

The jury returned an advisory verdict finding the Towns liable under § 12601.  After an evidentiary hearing, the district court issued a judgment holding the Towns liable under § 12601 for engaging in a pattern or practice of violating the First, Fourth, and Fourteenth Amendment rights of their residents.  The court determined that the Marshal's Office "fostered excessive government entanglement with religion" in an effort to "endors[e], favor[], or promot[e] the FLDS Church at the expense of non-FLDS residents."  The court also concluded that members of the Marshal's Office "selectively enforce[ed] the law based upon religion" and arrested several residents who were not FLDS members without probable cause.  The district court ordered injunctive relief requiring the Towns to, among other things, work with a court-appointed monitor to institute national guidelines for constitutional policing.

Although the Towns appealed the district court's finding of liability under § 12601, Hildale City has since withdrawn from this appeal.  Accordingly, we address only Colorado City's arguments.

## STANDARD OF REVIEW AND JURISDICTION

We have jurisdiction pursuant to 28 U.S.C. § 1291.

Whether the district court correctly interpreted 34 U.S.C. § 12601 is a legal question that we review de novo. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000). We review the court's factual findings for clear error. *United States v. Christensen*, 828 F.3d 763, 815 (9th Cir. 2015). We review de novo the court's interpretation of the hearsay rule, but review the court's admission of evidence for abuse of discretion. *United States v. Morales*, 720 F.3d 1194, 1199 (9th Cir. 2013).

## ANALYSIS

### I.   34 U.S.C. § 12601

The principal dispute in this case concerns the proper interpretation of 34 U.S.C. § 12601. That statute prohibits

> any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, [from engaging] in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

Colorado City argues that the district court erred by construing the statute as imposing liability on governments for patterns of constitutional violations committed by their officers and agents. It asserts that § 12601 requires the United States to demonstrate that the Towns "instituted an official municipal policy" of violating residents' constitutional rights. The United States, on the other hand, contends that the statute "imposes liability on municipalities for patterns of constitutional violations [that] their law

enforcement officers commit, without requiring an additional showing that the municipality's policy or custom caused those violations." This issue—whether § 12601 imposes *respondeat superior* liability[3]—is one of first impression in our circuit. *Cf. United States v. County. of Maricopa*, 889 F.3d 648, 653 (9th Cir. 2018) (finding it unnecessary to decide "whether the language of § 12601 imposes liability on the basis of general agency principles").

Colorado City relies on the premise that, by including "pattern or practice" in § 12601, Congress used "language with a well-defined meaning [] developed under [*Monell v. Department of Social Services*, 436 U.S. 658 (1978)] for municipal liability." That contention, however, confuses the relationship between general liability rules in civil rights statutes and the Supreme Court's decision in *Monell*.

"[T]he general rule regarding actions under civil rights statutes is that *respondeat superior* applies." *Bonner v. Lewis*, 857 F.2d 559, 566 (9th Cir. 1988). In *Monell*, the Court carved out an exception to this general rule by holding that a municipality may not be held liable pursuant to 42 U.S.C. § 1983 for the actions of its subordinates. Instead, to establish municipal liability, a plaintiff must show that a local government's "policy or custom" led to the plaintiff's injury. *Monell*, 436 U.S. at 694. In reaching its holding, the Court relied on "the language of § 1983, read against the background of the [statute's] legislative history." *Id.* at 691. Because § 1983 imposes liability only where a state actor, "under color of some official policy, 'causes' an employee

---

[3] *Respondeat superior* is "[t]he doctrine holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of employment or agency." Black's Law Dictionary (11th ed. 2019).

to violate another's constitutional rights," the Court reasoned that Congress did not intend to impose vicarious liability on municipalities "solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Id.* at 692. Moreover, in the Civil Rights Act of 1871—the predecessor statute to § 1983—Congress "did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691.

*Monell*'s holding remains the exception to the general rule.[4] We have declined to bar *respondeat superior* liability in other contexts. In *Bonner*, for example, we held that *respondeat superior* liability applies to claims pursuant to § 504 of the Rehabilitation Act of 1973 because "[t]he application of *respondeat superior* . . . [is] entirely consistent with the policy of that statute, which is to eliminate discrimination against the handicapped." 857 F.2d at 566–67 (quoting *Patton v. Cumpson*, 498 F. Supp. 933, 943 (S.D.N.Y. 1980)). And, in *Duvall v. County of Kitsap*, we held that *respondeat superior* liability applies to claims brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132. 260 F.3d 1124, 1141 (9th Cir. 2001).

We likewise decline to extend *Monell*'s holding to claims pursuant to § 12601. Several features of the statutory text lead us to that conclusion. *See Esquivel-Quintana v.*

---

[4] The Supreme Court has held that *respondeat superior* liability is also unavailable against local governments pursuant to 42 U.S.C. § 1981. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989). That decision was based on the fact that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981." *Id.*

*Sessions*, 137 S. Ct. 1562, 1568 (2017) ("We begin, as always, with the text.").

First, § 12601, unlike § 1983, does not include the words "under color of any law, statute, ordinance, regulation, custom or usage." That difference is important because, by including "custom" in § 1983, Congress expressly contemplated imposing liability on actors who violated constitutional rights under an official policy. The absence of that language from § 12601, therefore, suggests that Congress did not intend to limit liability to those acting under an official law or policy. Instead, the plain text of § 12601 shows that any government agent who engages in a pattern or practice of conduct that deprives persons of their constitutional rights violates § 12601.

Second, § 12601 does not limit liability to those who "cause [citizens or persons] to be subjected" to a deprivation of their constitutional rights. The *Monell* Court interpreted that language, which appears in § 1983, as imposing liability "on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell*, 436 U.S. at 692. The lack of that causal phrase in § 12601 suggests that Congress did not intend to limit local governments' liability to situations when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. Taken together, these statutory clues persuade us that Congress intended to allow for *respondeat superior* liability against local governments pursuant to § 12601.

In arguing that the statutory text supports its position, Colorado City relies on the fact that the phrase "pattern or practice" appears in both § 1983 and § 12601. That phrase,

it claims, "refers to the same language necessary to show a 'custom' under *Monell*."

We acknowledge that Congress used "pattern or practice" in both statutes, and are mindful that "[a] basic principle of interpretation is that courts ought to interpret similar language in the same way, unless context indicates that they should do otherwise." *Shirk v. United States ex rel. Dep't of Interior*, 773 F.3d 999, 1004 (9th Cir. 2014). That principle, however, does not necessarily support Colorado City's argument, for Congress has also used "pattern or practice" literally, rather than as a term of art, in several statutes. *See, e.g.*, 42 U.S.C. § 2000e-6(a) (authorizing the Attorney General to pursue injunctive relief in cases alleging a pattern or practice of employment discrimination); 42 U.S.C. § 3614(a) (authorizing the Attorney General to bring civil action in cases involving a pattern or practice of Fair Housing Act violations); 42 U.S.C. § 10101(e) (authorizing courts to find a pattern or practice of voting rights deprivations). Under those statutes, the United States must demonstrate only that the conduct alleged "was not an isolated or accidental or peculiar event." *United States v. Ironworkers Local 86*, 443 F.2d 544, 552 (9th Cir. 1971). It need not show the existence of an official policy or custom.

For this reason, Congress's use of "pattern or practice" in § 12601 does not support the weight that Colorado City wishes to place upon it. Congress could have used the phrase to refer to an official policy or custom, as in § 1983, but it also could have used the phrase to refer to a regular event, as in the statutes cited above.

Our interpretation of the statute aligns with our recognition that although "[§] 12601 shares important similarities with § 1983[,] . . . . the language of § 12601 goes even further than § 1983." *County of Maricopa*, 889 F.3d

at 653.    Had Congress wished to eliminate *respondeat superior* liability under § 12601, it could have easily done so with explicit statutory language.  *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 494 (1991).  Its decision not to do so suggests that it intended for § 12601, like most civil rights statutes, to allow for *respondeat superior* liability.

Unable to muster support for its position in the statutory text, Colorado City urges us to examine § 12601's legislative history.    But the Supreme Court has admonished that "legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018).  That principle is particularly salient in a case where the legislative history "is virtually non-existent."  Marshall Miller, *Police Brutality*, 17 Yale L. & Pol'y Rev. 149, 167 (1998); *cf. Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (declining to accord weight to the Medicare Act's legislative history when "the legislative history presented . . . is ambiguous at best").

Even if this case warranted consideration of it, the legislative history that Colorado City relies on does not support its argument.    Colorado City focuses on the legislative history of § 12601's predecessor bill, the Police Accountability Act of 1991 (PAA).  H.R. 2972, 102d Cong. (1991).  That history suggests that Congress enacted the PAA to "close [a] gap in the law"—the Justice Department's inability "to address systematic patterns or practices of police misconduct."  H.R. Rep. No. 102-242, pt. 1, at 137, 138 (1991).  The House Judiciary Committee did not define "pattern or practice," but did mention "[t]wo cases [that] illustrate both the need for this authority and how it will work."  *Id.*  One case involved police officers from Mason County, Washington who beat "citizens in four incidents" due to "the lack of training." *Id.* at 138–39.  The other case,

which arose from Goldsboro, North Carolina, involved "a young black man who was strangled to death by city police officers." *Id.* at 139. Congress did not suggest that either incident arose from an official policy or custom. Nonetheless, Colorado City contends that this history—although history of a different and superseded law—demonstrates that Congress did not intend to impose *respondeat superior* liability under § 12601.

We disagree. At best, the PAA's legislative history supports the argument that Congress passed § 12601's predecessor bill to allow the United States to prosecute municipalities when local police departments violate constitutional rights—whether or not those violations arose from an official policy or custom. Our construction of the statute, which allows local governments to be held liable when their agents engage in a pattern or practice of conduct that deprives persons of their constitutional rights, accords with that statutory purpose.

When interpreting legislation, our role "is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.'" *Burrage v. United States*, 571 U.S. 204, 218 (2014) (alteration in original) (quoting *Comm'r v. Lundy*, 516 U.S. 235, 252 (1996)). Section 12601 provides a civil cause of action to the United States Attorney General when a local government's agents "engage in a pattern or practice of conduct . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. § 12601. Because the statutory language does not demonstrate that Congress intended to exclude local governments from *respondeat superior* liability, we hold that § 12601 imposes liability based on general agency

principles.  Accordingly, the district court did not err in its construction of § 12601.**[5]**

## II. Factual Findings

Colorado City next argues that the district court made three mistakes in its factual findings related to the Towns' alleged violations of the Fourth Amendment.  First, it argues that the court erroneously included legal conclusions in its findings of fact, in violation of Federal Rule of Civil Procedure 52(a).  Second, it contends that the district court improperly adopted the government's proposed findings of fact and failed to independently evaluate the evidence.  Third, it argues that the court improperly made summary findings in its written judgment.

We need not address these alleged errors because they do not affect the district court's holding that Colorado City violated § 12601.  As the district court stated in its judgment, a finding "of a pattern or practice of violating any one of the three constitutional amendments in question"—the First, Fourth, and Fourteenth Amendments—"would entitle [the United States] to relief."  The district court held that the Towns violated all three constitutional amendments.

---

**[5]** We reject Colorado City's argument that our interpretation of 34 U.S.C. § 12601 violates § 5 of the Fourteenth Amendment.  It argues that the district court violated the Supreme Court's decision in *City of Canton v. Harris* because it "interpreted [§ 12601] to impose vicarious liability upon the Towns without requiring the United States to show that the Towns were responsible for the alleged misconduct."  489 U.S. 378 (1989).  Not so.  The Court's decision in *City of Canton*, which stated that permitting *respondeat superior* liability against local governments under § 1983 "would implicate serious questions of federalism," was limited to that statute.  *Id.* at 392.  The Court did not hold that it was unconstitutional to permit *respondeat superior* liability against local governments in any context.

Because Colorado City's arguments relate only to the court's findings of fact as to the Fourth Amendment violation, the court's judgment stands even if Colorado City is correct. Accordingly, any such purported error by the district court was harmless.

Colorado City urges us to nevertheless address the merits of its argument because "the district court's erroneous factual findings exposed the Towns to unfounded liability through lawsuits that Isaac Wyler, Patrick Pipkin, and Andrew Chatwin filed for unlawful arrest." Those lawsuits, however, are irrelevant to our harmless error analysis because the relevant question is "whether the [] verdict actually rendered in *this* trial" was attributable to the district court's error. *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Thus, the fact that other parties may have sued the Towns does not affect our conclusion.

## III.    Admission of FLDS Leaders' Statements

Finally, we turn to Colorado City's argument that the district court erred when it admitted the statements of various FLDS leaders under the co-conspirator exception to the rule against hearsay.

Before trial, the United States moved to admit several FLDS leaders' statements under the co-conspirator exception. Fed. R. Evid. 801(d)(2)(E); *see Bourjaily v. United States*, 483 U.S. 171, 173 (1987) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." (alterations in original)). The district court held the United States' motion in abeyance pending trial, reasoning:

> Although a final decision on this point must await trial evidence, prior proceedings in this case cause the court to believe that the United States will succeed in producing evidence of a joint venture or concert of action between the FLDS Church and the [Towns]. Subject to the United States proving up its concerted action contention, the court is prepared to rule that out-of-court statements of FLDS leaders in furtherance of concerted action between the FLDS Church and [the Towns] [are] not hearsay and [are] admissible.

Later during trial, the court determined that the United States had satisfied its burden of establishing the existence of a conspiracy. It instructed the jury that "the [United States] has made its case, as far as I am concerned, for purposes of the admission of the testimony, that there was a [conspiracy]."

Colorado City first argues that the district court clearly erred by finding the existence of a conspiracy between the Church and the Towns. Its contention rests largely on the claim that "[w]hen the district court 'tentatively' ruled that the United States had established a conspiracy, the evidence was insufficient to show the existence of a conspiracy for purposes of Rule 801(d)(2)(E)." That argument fails because "[i]t is not controlling [] whether sufficient independent evidence connecting [the Church] with the conspiracy existed at the time the trial judge made his first ruling under Rule 801(d)(2)(E)." *United States v. Watkins*, 600 F.2d 201, 204–05 (9th Cir. 1979). "In ascertaining whether the foundation has been established, we can, therefore, consider all the evidence independent of the challenged statements, regardless of the order of proof."

*United States v. Miranda-Uriarte*, 649 F.2d 1345, 1351 (9th Cir. 1981). The evidence must "be considered in a light most favorable to the government." *Id.*

Here, the United States presented extensive evidence at trial that supported the existence of a conspiracy between the Church and the Towns. That evidence included testimony that: officials from the Towns attended meetings in which FLDS leaders instructed them on how to handle legal issues in a way that advanced the Church's interests; Jeffs excommunicated the Towns' leaders who did not follow his orders; FLDS leaders determined who would occupy the Towns' government positions such as mayor, city council members, and police officers; the Marshal's Office was willfully blind to FLDS members' illegal activities; members of the Marshal's Office helped Jeffs evade capture by the FBI while he was a fugitive; and several of the Towns' officials "spied" on residents who the Church considered "out of conformance with [FLDS] regulations." Taken together, this evidence is sufficient to establish that the Towns conspired with FLDS members to advance the Church's illicit objectives. The district court did not clearly err in making that finding.

Colorado City also argues that the district court legally erred by misinterpreting the co-conspirator exception to the rule against hearsay. That argument, however, is belied by the record. The district court repeatedly acknowledged that a statement must be made in furtherance of a conspiracy to qualify under Rule 801(d)(2)(E). Moreover, when instructing the jury, the court accurately stated the standard for statements to fall under the co-conspirator exception: "one, certain individuals worked with the defendants toward a common goal in a joint venture or in a concerted effort and, two, that those individuals made out-of-court statements

during and in furtherance of that effort."   Accordingly, we reject Colorado City's argument that the court misconstrued the rules of evidence.

Lastly, contrary to Colorado City's argument, the district court did not abuse its discretion by admitting over twenty statements by FLDS leaders.   Several of the statements, including several transcriptions of Jeffs' dictations and telephone calls, were properly admitted under the co-conspirator exception.   These statements "catalogued and analyzed factors relevant" to the alleged conspiracy. *United States v. Schmit*, 881 F.2d 608, 612 (9th Cir. 1989).   They include statements by Jeffs recounting instructions he gave to FLDS members to perform underage marriages, describing the appointment of FLDS members to leadership positions in the Towns, and stating that FLDS members had gone into hiding "to not be served [] legal papers."   That "some portions of the statement[s] may have been 'idle chatter' or [']casual admissions of culpability' [does] not render" the statements inadmissible. *Id.*   That is especially true because, during trial, the Towns moved to exclude "the statement[s] as a whole" rather than "particular passages in the statement[s]." *Id*.

While certain other statements admitted by the district court and challenged by Colorado City do not fall under the co-conspirator exception in Rule 801(d)(2)(E), we hold that the district court did not err in admitting them because they were otherwise admissible. *See United States v. Alexander*, 48 F.3d 1477, 1487 (9th Cir. 1995) (upholding a district court's admission of evidence on a ground "different from the reason given by the district court").

Several of those statements were admissible because they were not hearsay.   These included instructions by Jeffs to FLDS members to not communicate with, and to

otherwise avoid, "apostates"—residents who were once FLDS members, but who had left the Church. *See United States v. Chung*, 659 F.3d 815, 833 (9th Cir. 2011) ("Instructions to an individual to do something are . . . not hearsay . . . because they are declarations of fact and therefore are not capable of being true or false." (alterations in original) (quoting *United States v. Reilly*, 33 F.3d 1396, 1410 (3d Cir. 1994))). Still others, such as Jeffs' statement that he prayed for the destruction of Arizona and Utah, were introduced for their effect on the listener. *See United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991).

Other challenged statements, such as Jeffs' statement about "[t]he attack of [] enemies upon [the FLDS community]," were admissible under the business records exception to the hearsay rule. Fed. R. Evid. 803(6). Despite the Towns' argument, Ranger John Nick Hanna was qualified to testify about Jeffs' dictations. Rule 803(6) "only requires [testimony by] 'someone with knowledge' about the record-keeping, not necessarily . . . someone with knowledge about how the reports were made or maintained," *ABS Entm't, Inc. v. CBS Corp.*, 908 F.3d 405, 426 (9th Cir. 2018), and Hanna had spent over four years studying the documents about which he testified. Colorado City has not not shown that the dictations do not meet the trustworthiness standard of the business records exception.

Even if the district court erroneously admitted some hearsay statements, reversal is not warranted. Because the jury rendered only an advisory verdict on the United States' § 12601 claim, our review is limited to "the findings of the court as if there had been no verdict from an advisory jury." *Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431, 1438 (9th Cir. 1983) (quoting 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2335 (3d ed.

1971)).  Because the judge ultimately ruled on the United States' § 12601 claim, the court "ha[d] discretion to receive evidence that might be inadmissible in a jury trial." *Hollinger v. United States*, 651 F.2d 636, 640 (9th Cir. 1981).  We conclude that because of the overwhelming evidence that Colorado City deprived non-FLDS residents of their constitutional rights, "it is more probable than not" that the court would have reached the same verdict on the United States' § 12601 claim even if the challenged statements had been excluded.  *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911 (9th Cir. 2008).

## CONCLUSION

In holding that the Towns violated § 12601, the district court correctly interpreted the statute and did not err in admitting the statements of FLDS leaders.  We need not address Colorado City's arguments about the district court's Fourth Amendment-related factual findings because, even if those arguments are correct, the error was harmless.

**AFFIRMED.**